IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

MILDRED CROWDER, as Personal
Representative of the Estate of
Timothy Johnson, Deceased                                    PLAINTIFF

v.                         No. 3:18-cv-131-DPM

CITY OF MANILA, ARKANSAS;
and JARED CAMP and JACKIE
HILL, Individually                                           DEFENDANTS

## ORDER

1. Mrs. Crowder pleads these sad facts against Manila, police officer Camp, and police chief Hill based on her son's death. The Court quotes her complaint (omitting the main paragraph numbers and creating several combined paragraphs) about what happened.

\* \* \*

Manila, Arkansas is a small town located in Mississippi County, Arkansas. Timothy Johnson was a troubled young man who had severe emotional and psychological problems. He was under the care of a doctor and had been diagnosed as suffering from schizophrenia, bi-polar disorder, and manic depression. Due to his conditions, Timothy was unemployed. His friend, Melinda White, allowed him to live in a camper in her back yard and would allow him to eat his meals with them and shower at their house. Timothy was withdrawn and did

not engage with many people. His social interactions were limited to some members of his family, Melinda White's family, and Kristi Greer, a young lady to whom he was attracted. Timothy had recently been rejected by Kristi Greer and was dejected and severely depressed. He was a cutter. Whenever something bothered him to the point of severe depression, he would cut himself. Timothy had tried to harm himself several times in the past and had an unsuccessful suicide attempt approximately a month before where he had cut his forearm to the bone. His medical care physician had prescribed him Seroquel, Zoloft, Prozac and Xanax.

In the morning of July 28, 2015, Kristi knocked on Melinda White's door telling them she'd found Timothy laying on his camper floor unconscious, unresponsive, and appearing not to be breathing. Melinda's son, Matthew White, ran to the camper and found Timothy as Kristi described. Matthew returned to the house and told Melinda to call 9-1-1, and then he, along with a visiting friend, Tiffany Boyd, ran to the camper to attend to Timothy. Camp responded along with the EMTs to the 9-1-1 dispatch. The EMTs revived Timothy who told them he was just trying to get attention from his girl friend. Camp and the EMTs left when Timothy refused further aid staying at the camper. Neither Camp nor the EMTs had any problem or difficulty with Timothy in their interactions with him.

Later that day, around 2 p.m., Camp accompanied the EMTs to Timothy's camper to retrieve a trauma bag that they had left there. Timothy opened the door to them and allowed them to retrieve the bag. Again, neither the EMTs nor Camp had problems from Timothy in their interactions with him. While there, Camp asked Melinda White if they knew Timothy to be a danger to anyone. She told him no. She told him that Timothy was not a danger to anyone, but himself; that he'd only hurt himself and not anyone else. He asked her if she was afraid of Timothy and she told him no.

Later that evening at approximately 8 p.m., Kristi knocked on Melinda White's door screaming that "Tim has done it this time, he is dead". Melinda White called 9-1-1 while Tiffany Boyd ran to the camper to find Timothy lying in the camper doorway with a thick white plastic zip tie pulled snug around his neck. Timothy's face and body were purple and he was unresponsive. Tiffany screamed for help and while waiting for help to come, pulled on the plastic zip tie as best as she could trying to create space for blood to flow and for Timothy to get some air. Melinda White's son, Matthew, arrived and cut the zip tie. Timothy gave a big gasp and stirred, but was confused and not all there. He had been with little to no oxygen for quite a long time. Shaken by what they had just experienced, Tiffany and Matthew returned to the house to await the arrival of the ambulance, leaving Kristi and her driver in their truck parked in the yard.

Camp received a call from dispatch that the EMTs had been called back to the camper for a man who had tried to hang himself. When Camp arrived and got out of his vehicle, he saw Timothy holding a knife in his right hand up to his neck. Camp drew his service revolver and told Timothy to put the knife down and they would talk through it. Camp told dispatch and other officers that he had a subject with a knife to his neck and he, Camp, had the subject at gunpoint. Timothy told Camp he was not going to put the knife down, but that he would cut himself, that he would do it. As Timothy took a couple of steps forward toward Camp, Camp told Timothy again to put the knife down and that he, Camp, would shoot Timothy if he did not stop.

At or around that time, they saw Chief Hill's car pulling into the driveway behind Camp's car. Timothy told Camp if anyone else showed up, he was going to cut himself. Camp told Timothy that it was just Jackie, Chief Hill, but to put the knife down because he wanted to help him. Timothy brought the knife down to his waist, slapped his forehead and said, "You wanna help me? Here, help me" and took two quick steps toward Camp. Chief Hill had been informed by the EMS personnel that they were responding to a call of a person who had tried to hang himself. Enroute, he heard Camp say he was on the scene and something about a gun, then something about a knife. Upon his arrival, as he approached Camp, he saw Timothy, someone he knew and had grown up with, and heard Timothy hollering "shoot me right here,

shoot me right here", as he pointed to his head. Hill saw Timothy take a few quick steps toward Camp and Camp taking a few steps back, fired his gun. According to Camp, Timothy was approximately 15' away when he fired his gun three times.

Throughout the entire time, Kristi Greer had remained in the yard talking and pleading with Timothy. She heard Timothy yell at Camp "get the f**k out of here". She heard Camp tell Timothy "I'm not here to arrest you; you've got people worried about you; and put the knife down", and as Timothy took a couple of steps toward Camp, Camp pulled his gun. Kristi heard Timothy yell at Camp, "shoot me, that's what I want you to do"; and as he took a couple more steps screaming at Camp, "Come on, I want you to do it", Camp fired his gun. № 1 at 4–8.

\*     \*     \*

Mrs. Crowder claims violations of the United States and Arkansas Constitutions, the Americans with Disabilities Act, the Rehabilitation Act, and the Arkansas Civil Rights Act. The Manila defendants say that, for various reasons, all her claims fail as a matter of law. The Court accepts the pleaded facts as true for the purposes of the Manila defendants' motion. *Crumpley-Patterson v. Trinity Lutheran Hospital*, 388 F.3d 588, 590 (8th Cir. 2004).

**2.** Mrs. Crowder's main claim is that officer Camp shot and killed Timothy when he didn't have to, violating the Fourth Amendment's

prohibition against unreasonable seizures. *Estate of Morgan v. Cook*, 686 F.3d 494, 496–98 (8th Cir. 2012). But, because officer Camp didn't violate Timothy's clearly established rights, he's entitled to qualified immunity.

Officer Camp returned that night to find Timothy with a knife to his own throat. He was distraught and screaming at Camp to shoot him. Timothy took a couple of steps toward Camp, holding the knife at his side. Camp tried to talk him down. He repeatedly told Timothy to drop the knife, warning him about what would happen if he continued moving forward with it. The officer backed up. Camp was right to do all these things. *Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir. 2012). But Timothy's quick movements, the knife, and the screaming made it a fraught situation, which then required a split-second decision. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*); *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

Mrs. Crowder presses that the fifteen feet separating Camp and Timothy when the officer fired, plus his dealings with Timothy and those that knew him earlier that day, made the officer's decision to shoot unreasonable. She also points out that, unlike Camp, Hill did not pull his pistol, much less shoot.

Distance matters, especially when an officer confronts someone with a knife. *Ludwig v. Anderson*, 54 F.3d 465, 473–74 (8th Cir. 1995). In the *Cook* case, six to twelve feet separated the officer and the person

with a knife. 686 F.3d at 498. Here, it was fifteen feet—and the gap was closing. Fifteen feet is about six steps. Timothy was moving toward Camp. Considering all the circumstances, the distance was close enough to put officer Camp and the others in danger.

Manila is the kind of small town where most folks know each other. For example, when chief Hill arrived, officer Camp told Timothy it was "just Jackie." № 1 at 7. Neither that background, Camp's interactions with Timothy earlier that day, Melinda White's firm opinion that Timothy wasn't a danger to anyone but himself, nor Hill's decision not to draw his weapon answers the law's question in this kind of situation. Was it objectively reasonable for a police officer to use deadly force against an emotionally distraught person with a knife, who was refusing to drop it, was advancing toward the officer, and was approximately fifteen feet away? Yes, it was. *Cook*, 686 F.3d at 497. Camp's knowledge about Timothy's "mental state does not change the fact he posed a deadly threat to the officers." *Hayek v. City of St. Paul*, 488 F.3d 1049, 1055 (8th Cir. 2007) (citation omitted).

Next, is officer Camp entitled to qualified immunity against Mrs. Crawford's ADA and Rehabilitation Act claims, which overlap in these circumstances? *Roberts v. City of Omaha*, 723 F.3d 966, 972–73 (8th Cir. 2013). He is. It's hard to craft a solid Title II claim in this context. There would need to be proof that an officer used force because of the victim's disability. *De Boise v. Taser International, Inc.*, 760 F.3d 892, 899 (8th Cir.

2014). There's nothing in the record that supports the conclusion that Camp's use of force was "by reason of [Timothy's] disability . . . ." *Ibid.* (quotation omitted). Instead, the record shows a quick decision about safety in tense and fluid circumstances involving an emotionally disturbed young man.

**3.** Mrs. Crowder's claims against chief Hill and Manila also fall short. She says that Hill "stood idly by" when Camp used deadly force. *№ 1 at 10.* But the facts show that Hill arrived mid-stream. Camp's quick decision doesn't allow for any "inference of tacit collaboration" between the two officers to arise. *Krout v. Goemmer,* 583 F.3d 557, 565 (8th Cir. 2009). And the failure-to-train claims against Hill and Manila fail because Camp didn't violate the Constitution. *Sanders v. City of Minneapolis, Minnesota,* 474 F.3d 523, 527 (8th Cir. 2007).

**4.** The Defendants' motion to dismiss, *№ 10,* is granted as modified. The federal claims against all defendants will be dismissed with prejudice. The Court declines to exercise jurisdiction over the state claims. 28 U.S.C. § 1367(c)(3); *Anderson v. Franklin County, Missouri,* 192 F.3d 1125, 1131 (8th Cir. 1999). They will be dismissed without prejudice.

So Ordered.

*DP Marshall Jr.*
D.P. Marshall Jr.
United States District Judge

11 January 2019