IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

MILDRED CROWDER, as Personal
Representative of the Estate of
Timothy Johnson, Deceased                                    PLAINTIFF

v.                           No. 3:18-cv-131-DPM

CITY OF MANILA, ARKANSAS;
JARED CAMP, Individually;  and
JACKIE HILL, Individually                                    DEFENDANTS

MEMORANDUM OPINION and ORDER

Manila police officer Jared Camp shot and killed Timothy Johnson
during an encounter in front of the camper where Johnson lived in a
friend's backyard.   Mildred Crowder, Johnson's mother and the
personal representative of his estate, has sued Officer Camp, Manila
Police Chief Jackie Hill, and the City alleging various constitutional and
state law violations.  This Court dismissed Crowder's complaint for
failing to state a claim.  Crowder appealed, and the Court of Appeals
reversed, holding that Crowder had alleged sufficient facts to state
claims of excessive force and failure to train under 42 U.S.C. § 1983,
failure to accommodate under the Americans with Disabilities Act and
Rehabilitation Act, and other claims under the Arkansas Civil
Rights Act.  796 F. App'x 325 (8th Cir. 2020) (*per curiam*).  The Court of
Appeals remanded the case for discovery and a merits ruling.  The

parties did extensive discovery. The record now contains several hundred pages of depositions and other evidentiary material. Crowder hired an expert, too. Officer Camp, Chief Hill, and Manila renew their request for summary judgment on this full record. Crowder presses for a trial. Where there is some genuine dispute of material fact, the Court has viewed the record in the light most favorable to Crowder. *Estate of Morgan v. Cook*, 686 F.3d 494, 496 (8th Cir. 2012).

Johnson was a troubled young man who suffered from schizophrenia, bi-polar disorder, and manic depression. These serious emotional and psychological problems caused him to engage in various types of self-harm, such as cutting and suicide attempts. He resided in the small town of Manila. He lived in a camper in Melinda White's backyard. She was a friend. Outside of some members of his family, White's family, and Kristi Greer, the young woman he was attracted to, Johnson had limited dealings with others. Before the day of the shooting, Greer had recently rejected him. He became increasingly dejected and depressed. Johnson, Officer Camp, Chief Hill, White, and Greer all knew each other.

On the day Johnson was killed, Officer Camp made three separate trips to Johnson's home. He and EMTs first responded to a morning 911 dispatch reporting that Johnson was unconscious and unresponsive on the ground outside his camper. Johnson had tightened a zip-tie around his neck, trying to kill himself. The EMTs revived the young

man, who later explained he was trying to get attention from Greer. Johnson was cooperative.  He created no difficulties for Officer Camp or the EMTs.  Officer Camp's second trip to the camper occurred a few hours later.  He went back with the EMTs to retrieve a trauma bag they had left behind that morning.   Johnson opened the door without protest, allowing them to retrieve the bag from inside his camper. While he was there, Officer Camp asked White if she thought Johnson was a danger to anyone and whether she was afraid of him.  White responded that he was a danger only to himself, not others.  She also said she wasn't afraid of him.  Officer Camp's third and final trip to the scene that day was prompted by a call from dispatch:  the EMTs had been called back to the camper to aid a man who had tried to hang himself.

Officer Camp arrived first, got out of his vehicle, and found three people there.  He saw Johnson holding a fillet knife with a six-inch blade to his own neck, Greer, who was hollering at Johnson to drop the knife, and a fellow in a pick-up truck.  (This was Ronnie Burse, who had driven Greer there.)  Officer Camp told Johnson to put the knife down and that the two would talk it out.  Officer Camp put his hand on his holstered .40 pistol.  Johnson warned Officer Camp not to allow anyone else to come to White's house.  When Johnson came toward him, Officer Camp backed up, drew his weapon, and told Johnson to put down the knife.  Officer Camp radioed dispatch and other officers

to let them know he had a man with a knife to his neck and that he, Camp, had the person at gunpoint. Johnson told Officer Camp he was not going to put the knife down, that he would cut himself, and that he wanted Officer Camp to shoot him. Johnson took a few steps toward Officer Camp, who backed up and warned Johnson that he would shoot him if he didn't stop. Around that time, Chief Hill pulled into the driveway. This further agitated Johnson. Officer Camp told Johnson that "it was just Jackie"—again, everyone knows everyone else in Manila—and repeated that they just wanted to help. Johnson brought the knife down to his waist, slapped his forehead, and said, "You wanna help me? Here, help me?" and took two or three quick steps toward Officer Camp. Johnson held his knife waist high, with the blade pointing toward Officer Camp. Officer Camp fired. Johnson's forward momentum continued. Officer Camp shot twice more. Johnson eventually collapsed two to three feet away from him. He had been approximately fifteen feet from Officer Camp when he started moving toward him, yelling.

The deep issue is whether Officer Camp's use of deadly force was objectively reasonable in the circumstances. Law enforcement officers cannot use deadly force absent some imminent threat to the safety of the officer or someone else. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012). Crowder argues that Officer Camp's use of deadly force was

unreasonable because he knew about Johnson's mental health issues and knew that he was not a danger to anyone other than himself. She emphasizes the two encounters Officer Camp had had earlier that day at Johnson's camper. Each time, Johnson complied with Officer Camp's directions and cooperated with the EMTs. Crowder also emphasizes Officer Camp's talk with White during the second encounter: White assured Officer Camp that Johnson wasn't a threat to anyone but himself. All these things are true but not determinative. That Officer Camp knew that Johnson was troubled, and had not endangered others before, doesn't change that Johnson posed a threat to Officer Camp and others during the third encounter. "[M]ental illness . . . does not reduce the immediate and significant threat a suspect poses." *Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020).

Crowder was not there. She acknowledges that she doesn't know exactly what happened during the third encounter. She doesn't dispute that, when Officer Camp arrived, Johnson was holding a knife and hollering, with Greer steps away. Distance matters when an officer confronts a person with a knife. *Ludwig v. Anderson*, 54 F.3d 465, 473-74 (8th Cir. 1995). Approximately fifteen feet first separated Officer Camp and Johnson. Johnson then began moving toward Officer Camp with a fillet knife held to his own throat. The officer retreated as he warned the young man to drop the knife or be shot. Officer Camp,

Greer, and Burse gave statements immediately after the shooting. Each said: Officer Camp ordered Johnson to drop the knife several times; he did not do so; and Johnson eventually lowered the fillet knife from his neck to his waist area, with the six-inch blade pointed forward, and then took a few quick steps toward Officer Camp. Chief Hill testified on deposition that Johnson moved aggressively toward Officer Camp before he fired. And the two EMTs, who had arrived later and were watching from inside their parked ambulance, both provided affidavits confirming that Johnson was advancing on the Manila officer. One said Johnson was moving forward, while Officer Camp was moving backward. The other said Johnson "charge[d] forward." *Doc. 59-1 at 114.*

Officer Camp's decision to use deadly force against an emotionally distraught person holding a knife, refusing to drop it, and advancing toward him from approximately fifteen feet away was objectively reasonable. *Estate of Morgan v. Cook*, 686 F.3d 494, 496-98 (8th Cir. 2012). "We have repeatedly concluded that officers could use deadly force to stop a person armed with a bladed weapon if they reasonably believed the person could kill or seriously injure others." *Quinones v. City of Edina*, 77 F.4th 1192, 1196 (8th Cir. 2023) (quotation omitted). Officer Camp is therefore entitled to qualified immunity on Crowder's constitutional and Arkansas Civil Rights Act claims. And because Officer Camp didn't violate the Constitution,

Crowder's failure to train claims against Chief Hill and Manila also fail as a matter of law. *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007).

Finally, Officer Camp is entitled to qualified immunity on Crowder's overlapping Americans with Disabilities and Rehabilitation Act claims. *Roberts v. City of Omaha*, 723 F.3d 966, 972-73 (8th Cir. 2013). There is no evidence that this officer used deadly force because of Johnson's mental disability. *De Boise v. Taser International, Inc.*, 760 F.3d 892, 899 (8th Cir. 2014). Rather, Officer Camp made a quick decision in stress-filled and fluid circumstances involving an emotionally disturbed young man holding a fillet knife. Officer Camp is therefore entitled to judgment as a matter of law on Crowder's ADA and Rehab Act claims.

*        *        *

Motion for summary judgment, *Doc. 59*, granted. Crowder's complaint will be dismissed with prejudice.

_____

D.P. Marshall Jr.
United States District Judge

29 September 2023